# EXHIBIT 2

## CONFIDENTIAL SETTLEMENT AGREEMENT AND AMENDMENT TO THE 1999 CONSULTING AGREEMENT

This Confidential Settlement Agreement and Amendment to the 1999 Consulting Agreement (this "Agreement") is entered into effective as of March 20, 2014 (the "Effective Date") by and among the following parties:

- Bath & Body Works, LLC, the successor by merger to Bath & Body Works, Inc., a Delaware limited liability company with offices at Seven Limited Parkway, Reynoldsburg, Ohio 43068 ("Bath & Body Works");

- Zaragoza & Zembrodt, LLC, an entity organized under the laws of the State of Ohio with its principal place of business at 1101 Panorama Drive, Covington, Kentucky 41011("Z&Z");

- Anthony Zembrodt, an individual and a member of Z&Z residing in the state of Kentucky ("Mr. Zembrodt"); and

- Robert Zaragoza, an individual and a member of Z&Z residing in the State of New York ("Mr. Zaragoza").

In this Agreement, Bath & Body Works, Z&Z, Mr. Zembrodt, and Mr. Zaragoza are referred to collectively as the "Parties" and individually as a "Party."

**WHEREAS** on December 31, 1999 the Parties entered into a Consulting Agreement (attached as Exhibit A) in connection with Bath & Body Works' Wallflowers® air freshener products (the "1999 Consulting Agreement");

**WHEREAS** a dispute arose among the Parties regarding payments based on "Future Services" royalties, as defined in the 1999 Consulting Agreement;

**WHEREAS** as a result of that dispute, Bath & Body Works filed in the United States District Court for the Southern District of Ohio a lawsuit captioned Bath & Body Works, LLC v. Zaragoza & Zembrodt, LLC, Anthony Zembrodt, and Robert Zaragoza, Civil Action No. 2:13-cv-1114-SMM (the "Litigation") seeking a declaration that Bath & Body Works is entitled to terminate payments comprising Future Services royalties as set forth in Paragraph 2 of the 1999 Consulting Agreement, and seeking a declaration that it is entitled to restitution for previous payments of such royalties;

**WHEREAS** Z&Z, Mr. Zembrodt, and Mr. Zaragoza denied Bath & Body Works' allegations in the Litigation, and Z&Z asserted counterclaims against Bath & Body Works for breach of contract for failure to pay Future Services royalties and seeking a declaration that that Bath & Body Works is obligated to pay to Z&Z payments for "Future Services" royalties from July 2013 to date, and further seeking a declaration that Z&Z did not fail to perform Future Services;

**WHEREAS** the Parties wish to resolve their disputes amicably on the terms set forth in this Agreement;

**NOW, THEREFORE,** for good and valuable consideration as set forth herein, the receipt and sufficiency of which are hereby acknowledged, and in further consideration of the mutual promises and covenants contained herein, intending to be legally bound, the Parties agree as follows:

## AGREEMENT

1. The Parties hereby amend the 1999 Consulting Agreement to remove all references to, and obligations to make, payments for Past Services and Future Services, and replace all such references and obligations with an obligation of Bath & Body Works, beginning with the 2014 first quarter payment, to pay to Z&Z a royalty of $.0675 per unit of Product (as defined in the 1999 Consulting Agreement) in the case of an air freshener (i.e., a fragrance dispenser) or a single bulb fragrance refill, regardless of whether the Product is packaged singly or in a larger quantity, and $0.135 per unit in the case of a "starter kit" (air freshener and single bulb fragrance refill sold together) or a 2-bulb pack fragrance refill, with such royalty to be paid quarterly pursuant to the procedures now followed by Bath & Body Works with respect to royalty payments under the 1999 Consulting Agreement. Payment procedures may be modified only if agreed to in a writing signed by the Parties. For the purpose of clarity, the Parties state that the payments to Z&Z provided for under this Agreement continue for as long as Bath & Body Works (or Related Persons or Affiliates as those terms are defined in Section 6 below) sells any Product as defined in the 1999 Consulting Agreement. Thus, the Parties agree that the royalty payment structure set forth in the 1999 Consulting Agreement is hereby null and void and has no force or effect, and that Bath & Body Works has no payment obligations to Mr. Zaragoza or Mr. Zembrodt or anyone affiliated with either of them, other than the foregoing payment obligation to Z&Z.

2. The Parties further amend the 1999 Consulting Agreement to remove all references to any obligation of Bath & Body Works to engage Z&Z, Mr. Zaragoza, or Mr. Zembrodt to perform any services, and to remove all references to any obligations of Z&Z, Mr. Zaragoza, or Mr. Zembrodt to provide any services to Bath & Body Works. All provisions of the 1999 Consulting Agreement not specifically amended by this Agreement shall remain in full force and effect.

3. With respect to Z&Z's claim to payments based on "Future Services" royalties allegedly withheld from royalty payments made by Bath & Body Works for the third and fourth calendar quarters of 2013, Bath & Body Works shall pay to Z&Z the amount of $360,691.68, representing a royalty of $.0075 per unit of Wallflower product, with such payment to be made by wire transfer to Z&Z within five (5) business days from the date that Z&Z signs this Agreement. For clarity, the $.0075 per unit royalty payment will result in a total royalty paid to Z&Z of $0.0675 per unit for the third and fourth calendar quarters of 2013.

4. Within five (5) business days of the Effective Date of this Agreement, the Parties will jointly dismiss with prejudice the Litigation and their respective claims asserted in the Litigation by filing with the Court in which the Litigation is pending the Stipulated Dismissal attached as Exhibit B.

5. Bath & Body Works represents and warrants that it currently has no claims against Z&Z, Mr. Zaragoza, or Mr. Zembrodt other than those raised in the Litigation and resolved in this Agreement. Z&Z, Mr. Zaragoza, and Mr. Zembrodt each represent and warrant that it or he currently has no claims against Bath & Body Works other than those raised in the Litigation and resolved in this Agreement.

6.      As used herein, "Related Persons" means a Party's shareholders, Affiliates, subsidiaries, members, parents, predecessors, successors, successors in interest, assigns, officers, directors, employees, agents, heirs, and estates.  "Affiliates" means any organization or entity that, at any time during the term of this Agreement, directly or indirectly, controls, is controlled by, or is under common control with a Party to this Agreement (where "control" refers to the ownership, directly or indirectly, of at least 50% of the voting securities or other ownership interests).

7.      Bath & Body Works and its Related Persons and Affiliates hereby release and discharge Z&Z, Zembrodt and Zaragoza and their Related Persons and Affiliates from any and all claims, counterclaims, demands or causes of action (in law or equity), suits, debts, liens, contracts, agreements, promises, liabilities, demands, damages, losses, costs, or expenses of any nature whatsoever (known or unknown, suspected or unsuspected, fixed or contingent) that any of them could or would be entitled to institute or assert against any of the foregoing, but such release and discharge is solely with respect to the 1999 Consulting Agreement, and matters raised or that could have been raised in the Litigation.  Nothing in the foregoing release is intended to release future claims or claims related to this Agreement.

8.      Effective upon the execution of this Agreement, Z&Z, Mr. Zaragoza, and Mr. Zembrodt and each of their Related Persons and Affiliates hereby release and discharge Bath & Body Works and its Related Persons and Affiliates from any and all claims, counterclaims, demands, causes of action (in law or equity), suits, debts, liens, contracts, agreements, promises, liabilities, demands, damages, losses, costs, or expenses of any nature whatsoever (known or unknown, suspected or unsuspected, fixed or contingent) that any of them could or would be entitled to institute or assert against any of the foregoing, but such release and discharge is solely with respect to the 1999 Consulting Agreement, and matters raised or that could have been raised in the Litigation.  Nothing in the foregoing release is intended to release future claims or claims related to this Agreement.

9.      The Parties and their respective Related Persons and Affiliates covenant and agree not to institute any action or proceeding against any of the others based on any claims that are released or intended to be released under this Agreement.

10.     The parties will bear their own attorneys' fees, costs and expenses in conjunction with the Litigation and this settlement and Agreement.

11.     This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective legal representatives, successors and assigns.

12.     The Parties will keep confidential the terms of this Agreement, except that the terms may be disclosed: to employees who have a need to know; to the Parties' attorneys and accountants; in a court action to enforce rights under this Agreement; or pursuant to an order by a court of competent jurisdiction.  Should either Party be served with a request to disclose this Agreement in whole or in part in a judicial proceeding, it will not do so before notifying the other Party in writing within twenty (20) days so as to provide such Party the opportunity to object to the disclosure and take appropriate action.  Should such objection be lodged, the Party served with the request will not disclose this Agreement pending disposition of such objection.

13.     Each of the representations and warranties made in this Agreement is made as a material inducement to the other Party to execute this Agreement and to enter into the compromises, settlements and releases contemplated herein and it is understood by all Parties that each Party hereto is relying upon such representations and warranties by the other Parties.

14.     Should any dispute arise between any of the Parties relating to this Agreement or any other matter, those Parties will first attempt in good faith to amicably resolve the dispute. The exclusive venue for any suit to interpret or enforce any terms of, or to resolve any dispute with respect to, the Agreement shall be the United States District Court for the Southern District of Ohio, Eastern Division and the Parties agree to submit themselves to the personal jurisdiction of that Court for that purpose. This Agreement shall be governed, interpreted and enforced in accordance with the laws of the State of Ohio without regard to its choice of law rules.

15.     The Parties agree that this is a compromise settlement and that the promises, mutual covenants, and agreements in consideration of the Agreement shall not be argued to be or construed as an admission of any liability or lack of liability or obligation by any Party to any other Party, or to any other person (except that the obligations undertaken here as part of this Agreement are fully binding).

16.     The terms and conditions of this Agreement are severable. If any condition of this Agreement is found to be illegal or unenforceable under any rule of law, all other terms shall remain in force. Further, the term or condition that is held to be illegal or unenforceable shall remain in effect as far as possible in accordance with the intention of the Parties.

17.     Any notices required or permitted by this Agreement shall be in writing and shall be sent to the parties as follows:

|  |  |
|---|---|
| For Z&Z, Mr. Zembrodt and Mr. Zaragoza: | By email and U.S. mail delivery to: Robin Miller Ulmer & Berne LLP 600 Vine Street Cincinnati, OH 45202 rmiller@ulmer.com |
| For Bath & Body Works: | By email and U.S. mail delivery to: Joseph Quigley Vice President - Intellectual Property Limited Brands, Inc. Three Limited Parkway Columbus, OH 43230 Email: jquigley@limitedbrands.com. |

18.     Bath & Body Works, Z&Z, Mr. Zembrodt, and Mr. Zaragoza each represent that it/he has not assigned or transferred any claim that is the subject of the Litigation or is affected by the releases granted in this Agreement.

4

19.     This is an enforceable Agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all previous communications, representations, agreements or understandings, either oral or written, among the Parties with respect to the subject matter hereof.

20.     This Agreement is the result of negotiations and shall not be construed more strictly against one Party than another Party. If any provision of this Agreement is found to be unlawful or unenforceable, such provision shall be deemed severed from the Agreement and in no way affect the validity or enforceability of the remaining provisions of this Agreement and the Parties shall negotiate in good faith with a view to the substitution therefor of a suitable and equitable provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of such severed provision.

21.     This Agreement, and/or any amendment thereto, may be executed in multiple counterparts, and if necessary by facsimile, and each of which shall be deemed an original Agreement upon the signature by each of the Parties on at least one counterpart, but all of which shall be deemed to be one and the same document.

22.     Each of the undersigned persons warrants that he has the full authority to enter into this Agreement on behalf of the Party for which he signs.

        IN WITNESS WHEREOF, and intending to be legally bound, the Parties have hereunto caused this Agreement to be executed on the date set forth below to be effective as of the Effective Date.

**BATH & BODY WORKS, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**ZARAGOZA & ZEMBRODT, LLC**

By: _ANTHONY_ _ZEMbRODT_

Name: _Zaragoza & Zembrodt/A. Zembrodt_

Title: _Member_

Date: _4/10/14_

**Robert Zaragoza**

_____

Date: _____

**Anthony Zembrodt**

_Anthony Zembrodt_

Date: _4/18/14_

5

19.   This is an enforceable Agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all previous communications, representations, agreements or understandings, either oral or written, among the Parties with respect to the subject matter hereof.

20.   This Agreement is the result of negotiations and shall not be construed more strictly against one Party than another Party. If any provision of this Agreement is found to be unlawful or unenforceable, such provision shall be deemed severed from the Agreement and in no way affect the validity or enforceability of the remaining provisions of this Agreement and the Parties shall negotiate in good faith with a view to the substitution therefor of a suitable and equitable provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of such severed provision.

21.   This Agreement, and/or any amendment thereto, may be executed in multiple counterparts, and if necessary by facsimile, and each of which shall be deemed an original Agreement upon the signature by each of the Parties on at least one counterpart, but all of which shall be deemed to be one and the same document.

22.   Each of the undersigned persons warrants that he has the full authority to enter into this Agreement on behalf of the Party for which he signs.

**IN WITNESS WHEREOF,** and intending to be legally bound, the Parties have hereunto caused this Agreement to be executed on the date set forth below to be effective as of the Effective Date.

**BATH & BODY WORKS, LLC**          **ZARAGOZA & ZEMBRODT, LLC**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

**Robert Zaragoza**

Date: 9/10/14

**Anthony Zembrodt**

Date: _____

5

19. This is an enforceable Agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all previous communications, representations, agreements or understandings, either oral or written, among the Parties with respect to the subject matter hereof.

20. This Agreement is the result of negotiations and shall not be construed more strictly against one Party than another Party. If any provision of this Agreement is found to be unlawful or unenforceable, such provision shall be deemed severed from the Agreement and in no way affect the validity or enforceability of the remaining provisions of this Agreement and the Parties shall negotiate in good faith with a view to the substitution therefor of a suitable and equitable provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of such severed provision.

21. This Agreement, and/or any amendment thereto, may be executed in multiple counterparts, and if necessary by facsimile, and each of which shall be deemed an original Agreement upon the signature by each of the Parties on at least one counterpart, but all of which shall be deemed to be one and the same document.

22. Each of the undersigned persons warrants that he has the full authority to enter into this Agreement on behalf of the Party for which he signs.

**IN WITNESS WHEREOF,** and intending to be legally bound, the Parties have hereunto caused this Agreement to be executed on the date set forth below to be effective as of the Effective Date.

| **BATH & BODY WORKS, LLC** | **ZARAGOZA & ZEMBRODT, LLC** |
|---|---|
| By: _Coupeler_ | By: _____ |
| Name: _Tom Javitch_ | Name: _____ |
| Title: _SV P/CFO_ | Title: _____ |
| Date: _4/10/2014_ | Date: _____ |
| | **Robert Zaragoza** |
| | _____ |
| | Date: _____ |
| | **Anthony Zembrodt** |
| | _____ |
| | Date: _____ |

5

# EXHIBIT A

## CONSULTING AGREEMENT

This Agreement for consulting services (this "Agreement"), by and among Bath & Body Works, Inc., a Delaware corporation ("Company"), Zaragoza & Zembrodt, L.L.C., an Ohio limited liability company ("Z&Z"), Anthony Zembrodt, an individual and a member of Z&Z ("Zembrodt") and Robert Zaragoza, an individual and a member of Z&Z ("Zaragoza") (Z&Z, Zembrodt and Zaragoza shall be collectively referred to herein as the "Consultants").

Company and Consultants agree as follows:

1.　Services and Compensation.　Company has engaged and will continue to engage Consultants to provide the services set forth on Exhibit A attached hereto (the "Future Services") in connection with the development, marketing, distribution and sale of an air freshener product and fragrance refills for the air freshener product, both of which employ heat generated by electricity to diffuse fragrance and freshen the air by evaporation of fragranced liquid from a wick.　Both the air freshener product and the fragrance refill product are more specifically described on Exhibit B to this Agreement (the "Products").　As used in this Agreement, the term Products includes any and all improvements, modifications, alterations and enhancements to the Products (the "Enhancements") relating to: (i) the design and fragrance qualifications and characteristics, (ii) UL approvals, (iii) child safety features, (iv) the electrical diffusion heating/wicking engine that drives the current Product, (v) the performance by Consultants of the Future Services listed on Exhibit A and (vi) joint developments of Company and Consultants, and in no event shall Company have any additional payment obligations to Consultants (other than the obligations set forth below in Section 2A) in connection with any such Enhancements.　If there are any other major technological developments (excluding those described above in this Section 1) which when combined with the Products create a new and different Product (e.g., an electric air freshener product with a light bulb or a blower), any such "major technological development" shall not be considered to be an Enhancement within the scope of this Agreement.

2.　Payment for the Services.

A.　In consideration for (i) the services performed by the Consultants in the past in connection with the development of the Products (the "Past Services") and (ii) the Future Services to be performed by the Consultants pursuant to the terms of this Agreement including, but not limited to, the development of Enhancements, Company hereby agrees to pay to the Consultants the following in connection with each purchase by Company of the Products:

| Product Purchased and Received by Company | Royalty Paid for Past Services | Royalty Paid for Future Services |
|---|---|---|
| Starter-Kit (1 engine and 1 refill) | $0.12 | $0.05 |
| Each Refill | $0.060 | $0.025 |

B.　Payments by Company to the Consultants pursuant to this Agreement will be made within thirty (30) days after receipt by Company of an invoice from Consultants, which invoice shall include all Products which Company actually receives from the manufacturer during the previous calendar quarter.　Receipt by Company of defective Products shall not be counted in determining Company's payment obligations to the Consultants pursuant to Section 2A of this Agreement.

C.　If Company determines that the Consultants have failed to perform any Future Services, Company shall provide written notification to the Consultants (the "Notification") describing the Consultants' failure to perform the Future Services.　Upon receipt of the Notification, the Consultants

shall promptly perform any and all required Future Services. If after Company has provided the Notification to the Consultants the Consultants have not promptly performed the Future Services, Company's payment obligations to Consultants with respect to the royalties to be paid for the performance of the Future Services shall be suspended until such time as Consultants have fully performed such Future Services (the non-performance by Consultants of the Future Services shall not affect Company's obligation to pay Consultants the royalties for the Past Services). The occurrence of the death or total and permanent disability (a "Catastrophic Event") of Zaragoza or Zembrodt shall not allow Company to suspend or terminate any portion of its payment obligations for Future Services as long as the Consultant who has not suffered a Catastrophic Event shall continue to use best efforts to perform the Future Services. In the event that both Zaragoza and Zembrodt suffer a Catastrophic Event prior to the full performance of the Future Services, the payment obligations of Company to Consultants for the peformance of the Future Services pursuant to Section 2A of this Agreement shall immediately terminate.

3. Confidentiality. Consultants agree that any and all information relating to the Products will be held in strictest confidence and will not be used by Consultants or disclosed to any third party for a period of three (3) years commencing on the effective date of this Agreement; provided, however, that any information which relates to Intellectual Property (defined below) and any confidential information relating to Company or any of Company's affiliates which does not relate to the Products shall be kept confidential and Consultants agree that they will not use or disclose to any third party any such confidential information for a ten (10) year period commencing on the effective date of this Agreement. For purposes of this Agreement, the following kinds of information shall not be deemed confidential: (i) information proven to be known by Consultants prior to the disclosure by Company, (ii) information available in the public domain, or (iii) information that is provided to Consultants by a third party without breach of any third party obligation of confidentiality.

4. Intellectual Property Ownership. Consultants and Company agree that Consultants and Company jointly have developed various portions of the Products and as such, Consultants and Company will both be entitled to use the information relating to the Products (excluding the Intellectual Property (defined below) and any information relating to the Intellectual Property) for any purpose following the expiration of the three (3) year exclusivity period set forth in Section 12 of this Agreement; provided, however, that Consultants hereby agree that Company has sole right, title and interest in and to the Intellectual Property (as defined below) and all additions to, deletions from, alterations of, improvements to or revisions in the Intellectual Property, including, but not limited to, the sole and exclusive right throughout the world in perpetuity to use, exploit, reproduce, edit, modify, alter or prepare derivative works based on the Intellectual Property or any part thereof by any means and in any media, and to distribute works in any form, now or hereafter known, which include the Intellectual Property in whole or in part. In accordance with the foregoing, Consultants agree and Consultants jointly and severally hereby grant, assign and transfer to Company all of their respective rights, titles and interests in and to such Intellectual Property, including the copyright, and/or any patent, mask work, trademark or other proprietary right to protection. For purposes of this Agreement, Intellectual Property shall mean and include, regardless of whether produced solely or jointly with others and whether in preliminary or final form and will include any pre-existing proprietary rights owned by Consultants to the extent such proprietary rights are incorporated into the Intellectual Property, the following: (i) any and all design and fragrance qualifications and characteristics relating to the Products, (ii) information relating to UL approvals, (iii) child safety features; (iv) all rights associated with the patent applications identified on Exhibit C hereto and any subsequently issued patents relating thereto; (v) all creative work conceived, created, produced or reduced to practice by Consultants during the term of this Agreement in connection with or related to the performance of the Future Services; (vi) any Enhancements to the electrical diffusion heating/wicking engine that drives the current Product; and (vii) joint developments of Company and Consultants. Consultants waive any and all claims that Consultants may now or hereafter have in any jurisdiction to so-called "moral rights" or rights of "droit moral" with respect to the

-2-

Intellectual Property and the Future Services. Consultants agree that Consultants will not retain any rights to create copies of any Intellectual Property or derivative works which incorporate any of the Intellectual Property, and that Consultants shall have no right to make, use, offer for sale, sell or import any packaging or product including the foregoing or any design or invention embodied therein.

5.      Obligations of Consultants. Consultants will promptly advise Company of all Intellectual Property created by Consultants. Consultants shall execute and shall cause any employees or agent of Consultants to execute such further instruments and provide such further assistance, without further charge, as Company may reasonably request to establish, register, maintain, protect or defend its right in and ownership of the Intellectual Property, including any rights to obtain patent, copyright or mask work protection or other proprietary rights in all countries of the world and this obligation shall survive the termination of this Agreement. Company shall pay all expenses incurred in connection with actions pursuant to this paragraph. Consultants agree that Company may use Consultants' names, photographs or other indicia of identification on and in connection with any Intellectual Property created pursuant to this Agreement; provided that such use shall be presented to Consultants for their reasonable approval.

6.      Representations of Consultants. Consultants, jointly and severally, represent and warrant that: (A) to the best knowledge of Consultants, all work performed by Consultants in connection with the development of the Products has been or will be an original work created solely by the Consultants and/or Jeyes International GmbH and has not been or will not be copied in whole or in part from any existing work that is not in the public domain and such work (other than any work in the public domain) has not been published in any form by distribution to the public by sale or other transfer of ownership or by rental, lease or lending and has not been distributed for purposes of further distribution or public display; (B) Z&Z has the full power and authority, and Zembrodt and Zaragoza have the legal capacity, to enter into this Agreement and the performance of this Agreement by Z&Z, Zembrodt and Zaragoza will not violate any agreement or obligation to which any one or more of the Consultants is a party; and (C) Consultants agree to perform the Services in compliance with all applicable laws, regulations and ordinances. The provisions of this paragraph shall survive the termination of this Agreement.

7.      Relationship of Parties. Consultants are independent contractors and shall be solely responsible for any unemployment or disability insurance payments, or any social security, income tax or other withholdings, deductions or payments which may be required by federal, state or local law with respect to any sums paid Consultants hereunder. Consultants shall not be entitled to any Company employee benefits of any nature. None of the Consultants are agents or representatives of Company and none have authority to speak or act for Company in any manner.

8.      Company Policies. Consultants agree to abide by Company's non-discrimination and non-harassment policies in all contacts with Company's associates, when on Company property or while representing Company in any manner. Consultants further agree to contact Company's Ethics Hot Line at (888) 884-7218 if Consultants believe that any of Company's associates are engaged in discriminatory or harassing behavior with respect to the Consultants or any third party.

9.      Term. This Agreement shall remain in effect until the performance by the Consultants of all of the Future Services set forth on Exhibit A and until all of Company's payment obligations set forth in Section 2A of this Agreement are satisfied.

10.     Remedies. Consultants' sole remedy, if any, for breach of this Agreement shall be money for breach of contract and in no event shall Company be liable to Consultants for any special, punitive, consequential, incidental, indirect or similar damages.

-3-

11.    Personal Services. The obligations of Consultants hereunder are unique in nature and this Agreement may not be assigned, subcontracted or delegated for performance, in whole or in part, by any other party without the written agreement of Company. As a condition to any consent by Company of such assignment or subcontract, Consultants shall obtain the written agreement of such approved assignee or subcontractors to all the terms and provisions of this Agreement relating to Confidential Information and Intellectual Property.

12.    Exclusivity/Noncompetition. For a period of three (3) years from the effective date of this Agreement, Consultants jointly and severally agree not to directly or indirectly engage in, or directly or indirectly assist any third party engaged in the home fragrance retail market anywhere throughout the world in, developing, producing, selling or marketing any forms of liquid electric home fragrance dispensing devices. Consultants agree that the restrictions contained in this Section 12 are reasonable and necessary to protect the legitimate business interests of Company and that a breach of this Section 12 by any one or more of the Consultants would cause immediate and irreparable harm to Company. Consequently, Consultants agree that in the event of a breach of this Section 12 by any one or more of the Consultants, Company shall be entitled to a temporary restraining order and other temporary or permanent injunctive relief. For purposes of this Section 12, the term Company shall include the Company and any affiliate of the Company.

13.    Miscellaneous. This Agreement contains the entire understanding of the parties and supersedes all prior agreements or understandings and may not be modified or terminated except in writing signed by the authorized representatives of Company and Z&Z and also signed by Zembrodt and Zaragoza. If any provision of this Agreement is held to be void, invalid, unenforceable or illegal by a court, the remaining provisions will remain valid and enforceable. Failure to enforce any provision of this Agreement will not constitute or be construed as a waiver of such provision or of the right to enforce such provision. Any rule of construction disfavoring the drafting party shall not apply in the construction of any provision of this Agreement. This Agreement may be executed in separate counterparts. All notices, requests, demands or other communications required or permitted to be given under this Agreement shall be given in writing and shall be deemed to have been given if delivered by any commercially reasonable written or electronic means upon receipt to the address and person listed on the signature page of this Agreement. This Agreement shall be binding upon the permitted successors and assigns of both parties and shall be governed by and construed and enforced in accordance with the laws of the State of Ohio applicable to agreements made and to be performed in Ohio, without regard to conflicts of laws principles. This Agreement shall be effective upon its execution by the parties and delivery of facsimile copies to each party.

This Agreement is executed by the parties effective as of the following date:
_Dec 31, 1999_

**BATH & BODY WORKS, INC.**
Seven Limited Parkway East
Reynoldsburg, Ohio 43068
Facsimile: (614) 856-6040

By: _____
Name: _DOUGLAS DALSTROM_
Title: _DIRECTOR OF SOURCING_

**ZARAGOZA & ZEMBRODT, L.L.C.**
1004 Park Lane
Covington, Kentucky 41011
Facsimile: (606) 431 5148

By: _____
Name: _ANTHONY R. ZEMBRODT_
Title: _MEMBER_

_____
Anthony R. Zembrodt, individually

_____
Robert Zaragoza, individually

–5–

## EXHIBIT A

In exchange for the royalties to be paid by Company to Consultants for the Future Services, the Consultants agree to provide the following:

Project management services in connection with electric diffuser fragrance dispensing devices (i.e., "Wallflowers Room Fragrance" type devices) including, but not limited to:

1. Development and qualification of new fragrances/mods;
2. Package/oil color matching to these new fragrance skus;
3. Aesthetic improvements to the package (i.e., new glass topper design, seasonal items like pumpkin/snowmen, etc.); and
4. Involvement (although Consultants shall not be wholly responsible) for specific project team activities including, but not limited to:

   a) regular conference calls/team meetings;
   b) periodic vendor site visits;
   c) development/process improvements and product enhancements; and
   d) serving as liaisons to vendor partners helping the Company team address specific issues that arise in connection with the production, sale and marketing of the Products.

Consultants will be reimbursed for all travel and out-of-pocket expenses (i.e., airfare, mold costs, etc.) incurred as a result of performing the aforementioned activities, provided, that Company pre-approves all such expenses.

−6−

## EXHIBIT B

Attached hereto.

NOV-17-1999  19:27     BATH & BODY WORKS     614 856 6213    P.11

# BATH & BODY WORKS

## PACKAGING SPECIFICATION

| | | | |
|---|---|---|---|
| Brand: | **White Barn Candle Co.** | Page: | **1** |
| Description: | **Wallflower Starter & Refill** | Revision: | **Original Issue** |
| Issue Date: | **10/15/99** | Supercedes: | |

**COMPONENTS**    Vendor is Jeyes unless otherwise noted

**Heater**
Material:    Reference attached document "QC testing requirements for Electric Diffuser" for Heater Materials

**Wick**
Material:    Internal: Polyester  External:  Woven Polyester
Size:    0.25" diameter x 3.11" long
Pins:    0.39" long.  Two per wick offset 90 degrees from the other.

**Wick Holder**
Size:    See attached drawing reference "Wick Holder" revision date 4/28/99
Material:    Polypropylene
Color:    Natural

**Housing**
Size:    See attached drawing reference "Housing" revsion date 4/21/99
Material:    Polyamide type 6 nylon
Min Thickness:    1.6mm
Color:    See SKU list page 2

**Flower**
Size    See attached drawing reference "Flower" revsion date 4/21/99
Material:    Polypropylene
Color:    See SKU list page 2

**Glass Flacon**
Vendor:    Pochet
Size:    See attached Pochet drawing #28009 revison date 7/16/99
Finish:    18mm special (reversed thread)
Overflow capcity:    29 ml
Deco:    Acid etch w/ embossing

**Cap**
Size:    See drawing reference "Cap" revision date 4/28/99
Material:    Polypropylene
Finish:    18mm reverse thread
Color:    White

# BATH & BODY WORKS

## PACKAGING SPECIFICATION

| | | | |
|---|---|---|---|
| Brand: | **White Barn Candle Co.** | Page: | **2** |
| Description: | **Wallflower Starter & Refill** | Revision: | **Original Issue** |
| Issue Date: | **10/15/99** | Supercedes: | |

### PRIMARY PACKAGING DESCRIPTION

**Clamshell Thermoform**

| | |
|---|---|
| Supplier: | J&J Packaging |
| Material: | PVC |
| Thickness: | .020" |
| Size: | 5-1/4" x 2-3/8" x 8-3/16" O.D. |
| Seal Type: | Interlocking buttons in each of 4 corners |

**Printed Chipboard Insert**

| | |
|---|---|
| Supplier: | J&J Packaging |
| Size: | 4-3/4" wide x 19-1/2" long die cut |
| Material: | .016" SBS |
| Deco: | Approved BBW artwork. See SKU list Page 2 |

### SECONDARY PACKAGING & OTHER COMPONENT DESCRIPTION

| | |
|---|---|
| UPC LABEL: | BBW supplied |
| SHIPPING LABEL: | BBW supplied<br>4" x 4" SCC-14 |
| SHIPPING CASE x 12: | Special Die cut with integrated 12 cell partition<br>(See attached drawing)<br>200# C-flute -OR- equivalent<br>16.25" x 12.21" x 8.19" (Starter)<br>16.25" x 10.00" x 8.19" (Refill)<br>**SHIPPER IS CONVEYABLE** |
| REFILL VOID INSERT x 2: | Die cut<br>200# C-flute -OR- equivalent<br>16.13" x 4.94" |
| PALLETIZATION: | See attached specification |

NOV-17-1999 19:27 BATH & BODY WORKS 614 856 6213 P.13

# BATH & BODY WORKS

## PACKAGING SPECIFICATION

| | | | |
|---|---|---|---|
| Brand: | **White Barn Candle Co.** | Page: | **3** |
| Description: | **Wallflower Starter & Refill** | Revision: | **Original Issue** |
| Issue Date: | **10/15/99** | Supercedes: | |

### CLOSURE TORQUES

Minimum Removal Torque after 24 hours:      4 to 8 in-lb.

### FILL DATA

Legal Fill:      25 ml -OR- 0.8 fl. oz.
Fill Point:      Cosmetic to shoulder

### UPC PLACEMENT

Looking at the Wallflower starter or refill package from the front, apply the UPC sticker on the right side panel centered on the base.

### FLAVORS AND FINISHED GOODS SKU NUMBERS

| F/G SKU | WIP# | FLAVOR |
|---|---|---|
| **Wallflower** | | |
| 47129957 | | Sparkling Green Apple |
| 47129902 | | Raspberry |
| 47129944 | | Cucumber Melon |
| 47129915 | | Freesia |
| 47129931 | | Juniper Breeze |
| 47129928 | | Plumeria |
| **2 pack Refill** | | |
| 47130027 | | Sparkling Green Apple |
| 47129973 | | Raspberry |
| 47130014 | | Cucumber Melon |
| 47129986 | | Freesia |
| 47130001 | | Juniper Breeze |
| 47129999 | | Plumeria |

# BATH & BODY WORKS

## PACKAGING SPECIFICATION

| | | | |
|---|---|---|---|
| Brand: | **White Barn Candle Co.** | Page: | **4** |
| Description: | **Wallflower Starter & Refill** | Revision: | **Original Issue** |
| Issue Date: | **10/16/99** | Supercedes: | |

### SPECIAL ASSEMBLY DIRECTIONS

1) When filling the bottles, care must be taken in order to avoid fragrance oil spilling onto the threads. This can cause removal torques to drop below the 4 in-lb. minimum and increase the risk of leakage.

2) The Wallflower starter requires 1 flower, 1 heater, and one fragrance bulb. The refill requires 2 fragrance bulbs only.

3) Care must be taken to ensure that the front panel of the insert card is facing out toward the front panel of the thermoform. The undercuts should only show out of the back panel.

4) When packing the starter kit and refills into the thermoforms, it is important that the WBCC logo is facing out toward the front panel.

5) It is important that the sealing buttons are seated properly so they will not come apart during shipment.

6) When packing the refills into the corrugated shipper, a void filler insert is required. Place 2 inserts lengthwise in between the thermoforms.

7) All shippers must be sealed with pressure sensitive tape with a minimum width of 1.875".

### GENERAL SPECIFICATIONS

1 - The fill code must be according to Intimate Brands SOP QC-12-CM. Any deviations must be granted in writing prior to production by Bath & Body Works Quality Control.

2 - All primary folding cartons (that are sold with product and have price tickets on them) must be date coded on the bottom of each carton. The code must be stamped or embossed on one of the minor flaps of the bottom of the folding carton following Intimate Brands SOP QC-12-CM.

3 - Material Data Safety Sheets must accompany any bulk products shipped to a secondary filler (vials, packettes, etc.)

4 - The following information must be clearly marked on at least two sides of the approved shipper, one short panel and one long panel, following SOP DC-1-REC. Deviations must be approved in writing prior to production by Bath & Body Works Quality Control.

5 - The major flaps of the shipper must be secured with tamper evident tape.

NOV-17-1999 19:28     BATH & BODY WORKS      614 856 6213    P.15

# BATH & BODY WORKS

## PACKAGING SPECIFICATION

| | | | |
|---|---|---|---|
| Brand: | **White Barn Candle Co.** | Page: | **5** |
| Description: | **Wallflower Starter & Refill** | Revision: **Original Issue** | |
| Issue Date: | **10/15/99** | Supercedes: | |

6 - Shippers containing alcohol-based products must be clearly marked with an ORM-D classification on at least two sides - one short and one long panel, not obscured with tape or other markings.

7 - Shippers must be placed on pallets with an interlocking pattern. Pattern recommended by shipper supplier. If no pattern specified, contact Bath & Body Works Package Engineering.

8 - Shipper containing products in folding cartons must be palletized and corner braced.

9 - All packers must be marked with the brand, product description (including flavor when applicable) and size.

10 - Follow all applicable SOP's in contract manufacturer handbook. Contact Quality Control in advance at 614-856-6382 with 48 hours notice to first production.

M 5:1

ø16-0,5
ø13±0,1
10.26±0,1
0.7

45°

R0.5

R0.5

11
12.5
2
2
2
0.15

Zeichnung geprüft
und freigegeben!
Jeyes Deutschland GmbH

29.6.99
Datum    Unterschrift

45°

15°
ø6.8+0,1
ø9.5
ø10.7+0,2

M 1:1

30°
R0.5

Fläche 6.5/6.8
6.8+0,1

60°

1.3+0,1

Platz für
Nest.Nr/Mat.-bez.

Weitergabe sowie Vervielfältigung dieser
Unterlage, Verwertung und Mitteilung ihres
Inhalts nicht gestattet, soweit nicht aus-
drücklich zugestanden. Zuwiderhandlungen
verpflichten zu Schadensersatz.
Alle Rechte für den Fall der Patenterteilung
oder GM-Eintragung vorbehalten.

2.8-0,1    4.5

Außenflächen strichpoliert
Abstimmen mit Verschluß

| Jeyes Deutschland GmbH | | | | | Maßstab | 5:1  1:1 | |
|---|---|---|---|---|---|---|---|
| | | | | | Mat:PP copo.  natur nach UL-Listung | | |
| | | | | Datum | Name | Wick  Holder | |
| | | | Bearb | 31.01.99 | Mack | | |
| | | | Gepr. | | | Wallflower | |
| | | | Norm | | | | |
| | | | | | | Einsatz | |
| | | | | Toleranzen nach DIN 16901-140 | | | |
| 1 | Rastnasen geändert | 28.04.99 | Mack | | | | |

NOV-17-1999  19:28     BATH & BODY WORKS          614 856 6213   P.17



M 1:1

⌀58.5

R0.8

R18

1.8

34+0.5

M 5:1

R15

2−0.1

1x45°

0.4+0.1

⌀25.5+0.1

⌀30+0.5

Zeichnung geprüft
und freigegeben !
Jeyes Deutschland GmbH

Datum    Unterschrift

Weitergabe sowie Vervielfältigung dieser
Unterlage, Verwertung und Mitteilung ihres
Inhalts nicht gestattet, soweit nicht aus-
drücklich zugestanden. Zuwiderhandlungen
verpflichten zu Schadensersatz.

Alle Rechte für den Fall der Patenterteilung
oder GM-Eintragung vorbehalten.

Abstimmen mit Oberteil
Geometrie nach Designmodell

| Maßstab | 5:1 · 1:1 |
| Mat: PP homopolym.  hochtransparent (1,8% PP) | |

Jeyes Deutschland GmbH

| | | | | Datum | Name |
| | | | Bearb | 31.01.99 | Mack |
| | | | Gepr. | | |
| | | | Norm | | |
| 2 | Rastung geändert | 21.04.99 | Mack | | |
| 1 | Gitter entfällt | 30.03.99 | Mack | | |
| Zust | Änderung | Datum | Name | | |

*Flower*

Wallflower

Toleranzen nach
DIN 16901−140

Blüte

NOV-17-1999  19:29      BATH & BODY WORKS              614 856 6213    P.19



This print is the property of verreries POCHET et du COURVAL and cannotbe reproduced or submitted to a third party without their consent.

Ce plan est la propriété des verreries POCHET et du COURVAL, il ne peuletre reprodult ou communiqué à des tiers sans leur consentement.Plan et cotes provisoires et côtes à confirmer d'après maquette et échantillon

NOV-17-1999  19:29  BATH & BODY WORKS  614 856 6213  P.20



M 3:1

Ø9/9.5
R5
R0.8
29.5
45°
R1
75°
3
1.5
1
1.2
14
4
1
Ø9+0.5
Ø16.2−0.2
Ø18.2+0.2
Ø21+0.2

Riffelung   M 10:1

M 1:1

R0.1
R0.1
90°
Ø21
3.6°
0.24

Zeichnung geprüft
und freigegeben!
Jeyes Deutschland GmbH
290699
Datum    Unterschrift

feinerodiert
0.2 erhaben

OPEN

Gewinde: GL 18 DIN 168
Steigung: 3mm
2,5 Gänge
linksgängig
mit Flasche abstimmen

Abstimmen mit Einsatz
Allg. Entformungsschräge 0,5°
Außenflächen hochglanzpoliert, Innen strichpoliert
Konturelektroden zur Genehmigung vorlegen

| | | | | | Maßstab | 3:1 | 10:1 , 1:1 |
|---|---|---|---|---|---|---|---|
| Jeyes Deutschland GmbH | | | | | Mat:PP homopolym. nach UL−Listung | | |
| | | | Datum | Name | | | |
| | | Bearb | 31.01.99 | Mack | Cap | | |
| | | Gepr. | | | Wallflower | | |
| | | Norm | | | | | |
| 2 | OPEN hinzu | 28.04.99 | Mack | Toleranzen nach DIN 16901−140 | Verschluß | | |
| 1 | Linksgewinde | 28.04.99 | Hack | | | | |

NOV-17-1999  19:29        BATH & BODY WORKS              614 856 6213   P.21

Product Code
Datafile Name   wallrevl (7/20/1999)
Solution Ref.     1 I
Volume Used      77.5 %                          8         Case / Layer
Area Used        84.9 %                          7         Layer / Load
Pallet type      48X40                          56         Case / Load

|  | Outside Dimension | | | | Weight | | |
|  | Length | Width | Height | | Net | Gross | Cube |
| Case | 16.375 | 12.438 | 8.938 in | | 5.400 | 5.400 lb | 1.05 cuft |
| Load | 48.000 | 40.000 | 68.063 in | | 302.400 | 352.400 lb | 75.63 cuft |



Wallflower Project
Pallet Pattern for approved shipper
Designed to accomodate the 74" racks

Pallet load size (inches) 45.2 x 37.2 x 62.6

Starter

NOV-17-1999  19:30      BATH & BODY WORKS          614 856 6213   P.22

```
Product Code
Datafile Name    wallrf (9/2/1999)
Solution Ref.     1 S
Volume Used     79.7 %                    10       Carton / Layer
Area Used       88.4 %                     7       Layer / Load
Pallet type     48X40                     70       Carton / Load
```

|        |        | Outside Dimension |        |     | Weight |         |
|--------|--------|-------|--------|--------|--------|---------|
|        | Length | Width | Height | Net | Gross | Cube    |
| Carton | 16.570 | 10.240 | 8.820 in | 5.900 | 5.900 lb | .87 cuft |
| Load   | 48.000 | 40.000 | 67.240 in | 413.000 | 463.000 lb | 74.71 cuft |

| //// | xxxx | [   ] | <----- |
|------|------|-------|--------|
| Length | Width | Height | Pad |









Pallet Pattern for Refills

Product Length - 47.3"
Product Wide - 37.0"
Product Height - 61.7"

Refill

NOV-17-1999 19:30     BATH & BODY WORKS     614 856 6213    P.23

## QC Testing Requirements for Electric Diffuser

Note: All testing is to be performed by _____ Testing Labs in _____ for initial production.
After UL listing is obtained, certain test methods will be waived.

### GENERAL TESTING:

| BBW QTM# | Standard | Test |
|----------|----------|------|
| EDTM-001 | n/a | Label Compliance[1] |
| INSP-001 | n/a | Visual Inspection per BBW Product Quality Manual |
| INSP-002 | n/a | Dimensional Measurements per BBW Product Quality Manual |
| EDTM-002 | n/a | Approved Materials[2] |

1 Compare labeling and markings on product to standard provided by BBW (see below).
2 Identify construction materials and compare to standard provided by BBW (see below).

### USE AND ABUSE TESTING:

| BBW QTM# | Standard | Test |
|----------|----------|------|
| EDTM-003 | n/a | Tension Test on Wick[3] |
| EDTM-004 | n/a | Tension Test on Glass Flower Topper[4] |
| EDTM-005 | n/a | Removal Torque for Cap - report torque value only, not pass-fail |
| EDTM-006 | n/a | Spark Test[5] |
| EDTM-007 | n/a | Match Test[6] |
| EDTM-008 | n/a | Spray and Splash Test[7] |

3 Tension 20 lbs. per ASTM F963-96a section 8.9
4 Tension 30 lbs. per ASTM F963-96a section 8.9
5 Procedure: Operate filled unit in a horizontal flammability cabinet adjacent to a UL listed 1875W hairdryer.
   Next operate hair dryer. When diffuser reaches equilibrium, unplug hairdryer. Report results.
6 Procedure: Operate filled unit in a horizontal flammability cabinet to equilibrium. Then introduce a lit match
   adjacent to the unit. Report results.
7 Procedure: Energize unit. Select random household chemicals such as hairspray, furniture polish,
   disinfectant, and paint primer. Spray chemical two feet above unit and allow droplets to fall
   directly on and into the unit. Report results.

### MATERIALS COMPATIBILITY AND FIRE HAZARDS TESTING:

| BBW QTM# | Standard | Test |
|----------|----------|------|
| EDTM-009 | n/a | Determination of Operating Temperature[8] |
| EDTM-010 | n/a | Explosiveness of Vapors[9] |
| EDTM-011 | n/a | Ignition Temperature[10] |
| EDTM-012 | ASTM D-90 | Flash Point |
| EDTM-013 | n/a | Exposure to Concentrated Vapors[11] |

NOV-17-1999  19:30          BATH & BODY WORKS          614 856 6213   P.24

| EDTM-014 | n/a | Infrared Analysis of Fragrance Solution[12] | .- |

8 Operate unit for 2 hours. Measure and report the temperature inside the hole of the heating element
next to the resistor. Report results both with and without fragrance in the diffuser.

9 Operate filled unit in a sealed container for 2 hours. Introduce a flame and report results.

10 Determine the minimum temperature at which the fragrance will ignite without flame application.

11 Operate unit in sealed container with fragrance solution for 30 days at room temperature or 15 days
with the container placed in a warm water bath of 60 degrees C. Report on structural integrity and
general condition of diffuser.

12 Procedure: Determine IR fingerprint of fragrance solution. Compare to standard provided by BBW.

## UL PRODUCT TESTING:

| BBW DTM | Standard | Test | BBW DTM |
|---------|----------|------|---------|
| EDTM-015 | UL499-30 | Leakage Current before humidity conditioning | |
| EDTM-016 | UL499-30 | Leakage Current after humidity conditioning | |
| EDTM-017 | UL1786-23 | Dielectric Voltage Withstand | |
| EDTM-018 | UL499-29 | Input Current and Wattage @ 120 VAC, 60 Hz | |
| EDTM-019 | UL1786-12 | Normal Operating Temperature | |
| EDTM-020 | UL1786-17 | Mold Stress from Oven Aging | |
| EDTM-021 | UL1786-20 | Impact Test (ball) | |
| EDTM-022 | n/a | Impact Test (drop)[13] | |
| EDTM-023 | UL746C-52 | Flammability | |
| EDTM-024 | UL1786-13 | Blanketing[14] | |
| EDTM-025 | UL1786-7 | Size and Weight - see also UL506 | |
| EDTM-026 | UL1786-16 | Security of Blades (pull test) | |
| EDTM-027 | UL498-70 | Security of Blades (push test) | |
| EDTM-028 | UL1786-6 | Accessibility of Live Parts (if applicable) | |
| EDTM-029 | n/a | Enclosure Securement[15] | |

13 Procedure: Drop unit onto a hardwood surface from a height of 3 feet. Failure occurs if the
functionality of the device is adversely affected and/or electrically live parts become
accessible.

14 Modify test as follows: Operate unit filled with fragrance.

15 Subjective evaluation addressing the ease of opening housing.

## APPROVED MATERIALS LIST:

| PART | DESCRIPTION |
|------|-------------|
| Petals | General Purpose Polypropylene |
| Housing | Polyamide (PA6) type 6 nylon, minimum thickness=1.6 mm[16] |
| Blade Assembly | Polyamide (PA66) type 66 nylon, minimum thickness=1.8 mm[17] + 25% glass-filled |
| Wick | Internal: paper. External: polyester |
| Stopper | General Purpose Polypropylene |
| Bottle | Glass |

| Heater | 6.5 Kohm, 2.2W@120 VAC metal oxide film resistor leads[18] |
| Wire Insulation | Silicone rubber, generic, O.D.=3mm, wall thickness=0.4mm | |

16 Bayer AG designation is Durethan (catalog# A30S)

17 BASF Polymers Division designation is Ultramid (catalog # A3X2G5)

18 Leads are tin-plated copper wire with diameter=0.8 +/- 0.03mm

LABELING/ARTWORK:



**Electric Oil Dispenser Proposed Labeling**

BDP 6/10/99

**1. Cast on the Unit**

Bath and Body Works          Confidential

NOV-17-1999  19:31      BATH & BODY WORKS           614 856 6213   P.26

```
┌─────────────────────┐
│ Ink jet date        │
│ code applied        │
│ by CTR              │
│ showing the         │
│ enclosure           │           ┌─────────────────┐
│ assembly date.      │           │ Cast on the     │
└─────────────────────┘           │ bottom plastic  │
                                  │ insert surface  │
                                  │ the words:      │
                                  │                 │
                                  │ This side       │
                                  │ down            │
                                  │ (1/8" letter ht.)│
                                  └─────────────────┘
```

_ABELING/ARTWORK (cont.):

---

### Electric Oil Dispenser Proposed Labeling(cont.)
**BDP 5/21/99**

**!.   Chipboard package for diffuser unit and 1 refill**

'   Manufactured for Bath & Body Works
    97 West Main Street
    New Albany, OH  43054  U.S.A

'   Diffuser Made in Germany
    Plug Assembled in Portugal
    Glass Made in France

    Note: The country of origin must be in close proximity to the BBW address.

'   Contents: 1 electric oil diffuser and 1 fragrance oil holder.

'   Fluid oz of the liquid fragrance.

'   "UL" mark

'   General statement saying how the unit plugs into a 110 volt electrical outlet, how long the fragrance will last in days(~45) and that refills are available in a variety of fragrances.

'   Important: Use only Bath & Body Works refills in this unit.   Bath & Body Works will not be held responsible for damage, injury or poor performance caused by use of other refills.

'   How to use the unit:  General intructions with pictures showing how to screw the glass container to the unit, how to correctly plug the unit(not upside down) into a 110 volt outlet and days of expected use with a statement/picture showing low fill level inside the glass container as the time discard the old refill and to buy a new refill.  Unplug the unit if a refill is not going to be used immediately.

'   Caution: Risk of electrical shock.  This product is not a toy and is for adult use only.  Contact with liquid may cause eye or skin irritation. If contact is made with eyes, flush with water for 15 minutes.  If irritation persists, consult a physician.  Keep out of reach of children to avoid exposure.  Use properly functioning 110 volt electrical outlet only.  Do not use in small, confined pet areas without adequate ventilation.

**!.   Chipboard package for 2 refills**

'   Manufactured for Bath & Body Works
    97 West Main Street
    New Albany, OH  43054  U.S.A

'   Refills Made in Germany
    Glass Made in France

    Note: The country of origin must be in close proximity to the BBW address.

'   Contents: 2 fragrance oil holders

NOV-17-1999  19:31          BATH & BODY WORKS               614 856 6213    P.27

Contents: 2 fragrance oil holders

Fluid oz of each liquid fragrance holder.

General statement saying how long the fragrance will last in days(~45) and that refills are available in a variety of fragrances.

- Important:  Use only Bath & Body Works refills in the electric oil diffuser.  Bath & Body Works will not be held responsible for damage, injury or poor performance caused by use of other refills.

- How to use the unit:  General intructions with pictures showing how to screw the glass container to the unit,  how to correctly plug the unit(not upside down) into a 110 volt outlet and days of expected use with a statement/picture showing low fill level inside the glass container as the time to discard the old refill and buy a new refill.   Unplug the unit if a refill is not going to be used immediately.

- Caution:  This product is not a toy and is for adult use only.  Contact with liquid may cause eye or skin irritation.  If contact is made with eyes, flush with water for 15 minutes.  If irritation persists, consult a physician.  Keep out of reach of children to avoid exposure.  Do not use in small, confined pet areas without adequate ventilation.

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BATH & BODY WORKS, LLC, | Civil Action No.: 2:13-cv-1114 |
| Plaintiff, | Judge Michael H. Watson |
| v. | Magistrate Judge Terence P. Kemp |
| ZARAGOZA & ZEMBRODT, LLC, ANTHONY ZEMBRODT, and ROBERT ZARAGOZA, | |
| Defendants. | |
| ZARAGOZA & ZEMBRODT, LLC, | JURY DEMANDED |
| Counterplaintiff, | |
| v. | |
| BATH & BODY WORKS, LLC, | |
| Counterdefendant. | |

**STIPULATION OF DISMISSAL**

Pursuant to Rule 41(a)(1) Plaintiff and Counterdefendant Bath & Body Works, LLC, the successor by merger to Bath & Body Works, Inc., and Defendant and Counterplaintiff Zaragoza & Zembrodt, LLC and Defendants Anthony Zembrodt and Robert Zaragoza, hereby stipulate and agree that the captioned action, including all claims, counterclaims, and affirmative defenses, are dismissed with prejudice, and without costs, disbursements, or attorneys' fees to any party, pursuant to the parties' Confidential Settlement Agreement.

Respectfully submitted this _____ day of April, 2014.


_____

Robin D. Miller (0074375)
Ulmer and Berne, LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
513.698.5054
rmiller@ulmer.com


*Attorneys for Zaragoza & Zembrodt, LLC, Anthony Zembrodt and Robert Zaragoza*

_____

Lynn Rzonca (*pro hac vice*)
Matthew R. Weaver (*pro hac vice*)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
215.665.8500
rzoncal@ballardspahr.com


Keith Shumate (0056190)
Heather Stutz (0078111)
Squire Sanders (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
614.365.2700
keith.shumate@squiresanders.com
heather.stutz@squiresanders.com


*Attorneys for Bath & Body Works, LLC*


SO ORDERED:

_____

Dated: _____

Michael H. Watson
United States District Judge


CIN2000 1070105v1
26654.00001